IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MAYO CLINIC JACKSONVILLE,
MAYO FOUNDATION FOR MEDICAL
EDUCATION AND RESEARCH,
MYRIAD GENETICS, INC., and
MYRIAD PHARMACEUTICALS, INC.,

        Plaintiffs/Counter-Defendants,

    v.

ALZHEIMER'S INSTITUTE OF AMERICA,
INC.,

        Defendant/Counter-Plaintiff.

Case No.:  8:05-cv-00639-SDM-TBM
            8:05-cv-01049-SDM-TBM

**PLAINTIFFS' OPENING *MARKMAN* BRIEF**

I.      INTRODUCTION ........................................................................................1

II.     FACTUAL BACKGROUND ......................................................................2

     A.     The Swedish Mutation, Amyloid Precursor Protein
            ("APP"), Amyloid-Beta ("Aß") and APP Isoforms.........................2

     B.     The Patents-in-Suit..........................................................................4

III.    ARGUMENT ...........................................................................................8

     A.     Legal Standards for Claim Construction............................................8

           1.     Claims Should Be Given Their "Ordinary"
                  Meaning in Light of the Intrinsic Evidence: the
                  Patent Claims, the Patent Specification and the
                  Prosecution History before the Patent Office ........................8

           2.     Where Appropriate, a Court May Consider
                    Extrinsic Evidence to Determine the Meaning of
                  Claim Terms..................................................................10

     B.     The Court Should Adopt Plaintiffs' Proposed
            Construction of the Disputed Claim Terms. .....................................11

           1.     The '169 patent ................................................................11

                  a)     "An isolated nucleic acid encoding
                        human amyloid precursor protein 770
                        (APP No)" – Claim 1 and dependent
                        claims .................................................................11

                  b)     "an isolated fragment of said nucleic
                        acid" – Claim 1 and dependent claims.........................12

                  c)     "fragment thereof" – Claims 10-12................................16

                  d)     "immortalized mammalian cell line"  --
                        Claims 10-12 ......................................................18

                  e)     "vector operable in a mammalian cell" –
                        Claim 9...............................................................18

            2.     The '963 Patent ...............................................................20

                  a)     "purified" ...........................................................21

                  b)     "polypeptide encoded by a nucleic acid
                        which encodes a human amyloid
                        precursor protein" ...............................................23

IV.    CONCLUSION.................................................................................................................24

Plaintiffs respectfully move the Court to construe certain disputed claim terms in the two patents-in-suit: U.S. Patent No. 5,455,169 ("'169 patent") and U.S. Patent No. 5,795,963 ("'963 patent") under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). Plaintiffs provide the following memorandum in support of their claim constructions. Plaintiffs certify that they have conferred with Alzheimer's Institute of America ("AIA") under Local Rule 3.01(g) in a good faith effort to resolve the issues raised by this motion, but the parties were unable to agree on a resolution.

Pursuant to Local Rule 3.01(j), Plaintiffs request oral argument on this motion and estimate that the time required for such argument is one hour.

## I.  INTRODUCTION

Throughout the long history of this dispute, AIA has consistently tried to claim that which it does not own.  Having sued the only party to license AIA's patent rights—the Mayo Clinic—AIA has falsely claimed through various theories over the past six years that it is owed millions of dollars, despite receiving from Mayo in excess of a million dollars in royalties for a technology AIA itself has never used.  In the arbitration, AIA claimed damages of over $20 million for alleged breaches of license, a sum vastly in excess of the total monies Mayo had earned from the license.  The arbitrator awarded AIA nothing.  And now in this litigation, AIA claims it should be awarded millions of dollars in "damages" from Myriad as compensation for alleged infringement that AIA claims is related to the drug FLURIZAN®, which Myriad never sold, and on which Myriad lost over $100 million.

AIA continues its pattern of over-reaching through its proposed claim constructions. Each of its constructions attempt impermissibly to expand AIA's patent claims to capture

technology that the claims simply do not cover—most significantly, cell lines employing the amyloid precursor protein ("APP") 695 isoform. As they plainly state, the claims of the '169 patent are limited to the APP770 isoform and "fragments" of that isoform. They do not cover other known isoforms of APP, like the APP695 isoform.

At the end of the day, while they may relate to complex biotechnology, the claims of the patents-in-suit are simple and straightforward. They say what they mean and mean what they say. This Court should apply their straightforward meaning, as demonstrated below, and reject AIA's efforts to broaden the patent claims beyond their clear scope.

## II. FACTUAL BACKGROUND

### A. The Swedish Mutation, Amyloid Precursor Protein ("APP"), Amyloid-Beta ("Aß") and APP Isoforms

Broadly speaking, the patents-in-suit relate to a genetic mutation called the Swedish mutation. (Cotton Dec. Ex. A and Ex. B.) People who carry the Swedish mutation develop Alzheimer's disease at a very early age, on average at around 55 years old. (Cotton Dec. Ex. C at 345.)

A genetic mutation like the Swedish mutation is a change in a gene from its normal form. (Sisodia Dec. at ¶ 6.) While we all know genes as the basic components of heredity, a key aspect of them to molecular biologists is that genes "encode" proteins (also known as "polypeptides"), the building blocks of cells. (*Id*.) By "encode," molecular biologists mean that the DNA[1] in a gene has the appropriate genetic code to allow a cell to make ("express") a particular protein. (*Id*.) Proteins are made of differing combinations of "amino acids," of

---

[1] "DNA" stands for deoxyribonucleic acid, and is the well-known double-helix structure depicted in popular culture. (Sisodia Dec. at ¶ 6.)

which there are twenty found in mammalian cells.  (*Id.*)

One of the hallmarks of Alzheimer's disease is the presence of what are known as "plaques" within the victim's brain.  (*Id.* at ¶ 9.)  In reality, these plaques are large aggregates of a protein called amyloid-beta, commonly abbreviated as Aß.  (*Id.*)  Aß is created when a larger protein called amyloid precursor protein ("APP") is cut into pieces resulting in Aß and other fragments, as part of normal cellular processes.  (*Id.*)

People with the Swedish mutation carry it in their APP gene—i.e., the gene that expresses APP.  (*Id.* at ¶ 10.)  In these people, an altered APP is expressed that results in increased levels of Aß.  (*Id.*)  This is believed to be at the heart of why people who carry the Swedish mutation develop Alzheimer's disease at such a young age.  (*Id.*)

In human beings, APP is expressed in all cells, and different cell types (e.g., nerve cells vs. liver cells) express different types of APP.  (*Id.* at ¶ 11.)  These different types of APP are called "isoforms" of one another.  (*Id.*)  While all isoforms of APP are derived from the same APP gene, each isoform is a different protein with a unique size and sequence.  (*Id.*)  They are not "fragments" of each other in any way.  (*Id.*)  The isoforms are named according to the number of amino acids they contain.  (*Id.* at ¶ 12.)  The known APP isoforms that contain the Swedish mutation include APP770, APP752, APP751, APP733, APP714, APP695, APP677, and APP639 *(id.)*, which are graphically depicted below.  (Chromosome 21 is simply the location of the APP gene.)  (*Id.*)



The Swedish mutation causes the wrong amino acids to be placed into APP in two different places. (*Id*. at ¶ 13.) In APP770, which is 770 amino acids long, the mutation causes the amino acid asparagine instead of lysine to be placed at amino acid number 670, and at amino acid number 671, leucine is placed instead of methionine. (*Id*.) Because the other APP isoforms each have different total numbers of amino acids, the respective locations of the Swedish mutation vary from one isoform to another. (*Id*.) In APP695, for example, the Swedish mutation appears at amino acid numbers 595 and 596. (*Id*.)

**B. The Patents-in-Suit**

The two patents-in-suit both claim certain biologic materials that contain the Swedish mutation. (Cotton Dec. Ex A at 17:62-18:7; 18:62-20:12 and Ex. B at 19:1-20:2.) The earlier of the two patents, the '169 patent, relates only to the APP770 isoform. (Cotton Dec. Ex A at 17:62-18:7; 18:62-20:12.) The lone independent[2] claim of the patent, Claim 1, reads as follows:

---

[2] Claims are "independent" if they stand alone. Claims are "dependent" if, in their text, they reference another claim.

1. An isolated nucleic acid encoding human amyloid precursor protein 770 (APP No) including the nucleotides encoding codon[3] 670 and 671 of human amyloid precursor protein 770, wherein the nucleic acid encodes asparagine at codon 670 and/or leucine at codon 671 or an isolated fragment of said nucleic acid having at least ten nucleotides and encoding at least positions 4 and 5 of SEQ ID NO:1.

(Cotton Dec. Ex. A at 17:63-18:2.)

By its plain language, this claim is limited to a piece of DNA or RNA[4] (an "isolated nucleic acid") that encodes the APP770 isoform with the Swedish mutation ("wherein the nucleic acid encodes asparagine at codon 670 and/or leucine at codon 671") or fragments of that isoform. It does not cover DNA or RNA that encodes the other APP isoforms listed above, i.e. APP752, APP751, APP733, APP714, APP695, APP677, and APP639.

In contrast, the '963 patent relates to all of the different APP isoforms containing the Swedish mutation. (Cotton Dec. Ex. B at 19:1-20: 2.) The only claim of the patent states:

1. A purified and isolated polypeptide encoded by a nucleic acid which encodes a human amyloid precursor protein including the nucleotides encoding codon 670 and 671 of human amyloid precursor protein 770 (APP NO.), wherein the nucleic acid encodes an asparagine at codon 670 and/or a leucine at codon 671.

(*Id.*) By its plain language, this claim covers a "purified" preparation of a protein ("polypeptide") that is encoded by a piece of DNA or RNA ("a nucleic acid") that encodes APP and that contains the Swedish mutation ("wherein the nucleic acid encodes an asparagine at codon 670 and/or a leucine at codon 671"). Simply put, this claim covers "purified" and "isolated" APP (i.e., any of its isoforms) that contains the Swedish mutation.

---

[3]   A "codon" is a segment of a nucleic acid that is three nucleotides long – i.e., enough to encode a single amino acid. (Sisodia Dec. at ¶ 7.)

[4]   "RNA" stands for ribonucleic acid, and is a single strand, in comparison to DNA's double-helix. (*Id.* at ¶ 8.) Both contain the genetic code that makes up who we are. (*Id.*)

The different scope of the two patents is no accident.  When AIA first applied for what ultimately became the '169 patent, AIA initially sought much broader patent claims that did not limit its patent to the APP770 isoform.  (Cotton Dec. Ex. D at 34-37.)  Original Claim 1 of the patent application stated as follows:

> 1.      An isolated nucleic acid *characteristic of human amyloid precursor protein* including the nucleotides encoding codon 670 and 671 of human amyloid precursor protein 770 where the nucleic acid encodes an amino acid other than lysine at codon 670 and/or an amino acid other than methionine at codon 671.  (Cotton Dec. D at 34 (emphasis added).)

Had it issued, this claim would have covered any isolated nucleic acid that encoded any of the various isoforms of APP that contained the Swedish mutation.  But the PTO rejected this broad claim repeatedly in multiple office actions under Sections 102(a) and 112 of the Patent Act (35 U.S.C. §§ 102(a) & 112).  (Cotton Dec. Ex. E at 3-5, 7; Ex. F at 2-3.)  After the Examiner issued his final rejection, AIA agreed to narrow the claim somewhat (Cotton Dec. Ex. G at 1-3), but the Examiner responded by telling AIA it needed to narrow the claim even further.  (Cotton Dec. Ex. H.)  Specifically, the Examiner issued an "Advisory Action," in which he explicitly told AIA that its claims needed to be limited to APP770, instead of APP more generally, as follows:

> "*[T]he claims should encode APP770*, not be "characteristic" of APP or fragments per 112 rejection."  (Cotton Dec. Ex. H.)

Thereafter, AIA spoke personally with the Examiner and reached agreement on narrower claims that were proposed by the Examiner himself.  (Cotton Dec. Ex. I.)  These narrower claims limited the claim specifically to nucleic acids encoding the APP770 isoform or fragments thereof.  (Cotton Dec. Ex. J at 3.)  The exact amendment entered by the

Examiner to narrow claim 1 is depicted below:

```
Claim 1, line 1, replace "characteristic of" with -- encoding --.
Claim 1, line 2, after "protein" insert -- 770 (APP 770)--.
Claim 1, line 6, after "671", add -- or an isolated fragment of
said nucleic acid having at least ten nucleotides and encoding at
least positions 4 and 5 of SEQ ID NO:1 --.
```

(*Id.*)

As can readily be seen, the Examiner explicitly inserted the particular isoform—770—into the claim. What had previously said "amyloid precursor protein" was rewritten by the Examiner to say "amyloid precursor protein 770 (APP 770)." After AIA agreed to this narrowing amendment, the '169 patent issued.

Not satisfied with the '169 claims, AIA ultimately went back to the Patent Office for additional patent claims that were not limited to the APP770 isoform. Through these efforts by AIA, later patents issued in the same family: the '963 patent-in-suit and U.S. Patent Nos. 6,818,448 (the "'448 patent"). (Cotton Dec. Exs. B and K.) As demonstrated above with respect to the '963 patent, and below with respect to the '448 patent, these later patents cover technology related to all the APP isoforms, in contrast to the '169 patent, which the Examiner limited to the APP770 isoform.

Now, over a decade later, AIA seeks to abrogate the bargain it made with the Patent Office by expanding the '169 patent to cover all APP isoforms. The Court should reject these efforts and construe the '169 patent claims, as well as those of the '963 patent, according to their plain meaning.

## III.  ARGUMENT

### A.    Legal Standards for Claim Construction

#### 1.  Claims Should Be Given Their "Ordinary" Meaning in Light of the Intrinsic Evidence: the Patent Claims, the Patent Specification and the Prosecution History before the Patent Office

Claim construction is a question of law.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).  The words used to claim an invention "are generally given their ordinary and customary meaning."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1313.

To determine how a person of skill in the art would understand a claim term, a court should review the claims, the specification, and the prosecution history, which is "the complete record of proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent."  *Id.* at 1317  This so-called "intrinsic evidence," provides the most significant evidence of a claim's meaning.  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The first, and most important, intrinsic source is the claim language.  "[A] claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (internal brackets and quotation marks omitted).   The context in which a claim uses a term, as well as the context provided

by other claims, sheds light on the term's meaning. *Phillips*, 415 F.3d at 1314–15 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."); *see also Vitronics*, 90 F.3d at 1582 ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.").

The second intrinsic source is the patent specification. "In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." *Phillips*, 415 F.3d at 1316. In some circumstances, a patentee may use the specification to assign unique definitions to the words used in the claims. *Phillips*, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term … that differs from the meaning it would otherwise possess.") To act as a so-called "lexicographer," a patentee must make certain that "the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582.

The third intrinsic source is the patent's prosecution history. *Phillips*, 415 F.3d at 1317. The prosecution history reveals how both the patentee and United States Patent and Trademark Office ("PTO") viewed the claimed inventions and understood the patent. *Id.* Additional evidence relevant to claim construction may be found in related patents – i.e., those patents that issued from the same specification or a very similar one to the patent that is being construed, as is the case here. A related patent's claims, specification and file history are all potentially relevant to claim construction. *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because NTP's patents all derive from the same

parent application and share many common terms, we must interpret the claims consistently across all asserted patents."); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349–50 (Fed. Cir. 2004) ("[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in the second patent stemming from the same parent application.").

### 2. Where Appropriate, a Court May Consider Extrinsic Evidence to Determine the Meaning of Claim Terms

Evidence outside of the intrinsic record is considered "extrinsic," and may include sources such as expert testimony, dictionaries, and treatises. *Markman*, 52 F.3d at 980. Extrinsic evidence is useful when a Court must determine the meaning of "terms that have a particular meaning in a field of art." *Phillips*, 415 F.3d at 1314. In such circumstances, extrinsic evidence can help the Court understand how a person of skill in the art would understand the terms. *Id.* To that end, "judges are free to consult dictionaries and technical treatises at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23 (internal quotation marks omitted). Aside from dictionaries and technical treatises, expert testimony may also be useful to explain an invention, provide an overview of the relevant technology, or identify a claim term's accepted meaning in the field of art at issue. *See Phillips*, 415 F.3d at 1318.

**B.** **The Court Should Adopt Plaintiffs' Proposed Construction of the Disputed Claim Terms.**

**1. The '169 patent**

**a) "An isolated nucleic acid encoding human amyloid precursor protein 770 (APP No)" – Claim 1 and dependent claims**

**Plaintiffs' proposed construction:** "a nucleic acid free of at least some of the contaminants associated with the nucleic acid or polypeptides occurring in a natural environment *that encodes* the APP 770 isoform of the human amyloid precursor protein"

**AIA's proposed construction:** "a nucleic acid that is free of at least some of the contaminants associated with the nucleic acid or polypeptides occurring in a natural environment and that has a sequence *that can encode* for APP770"

Based on their respective constructions, the parties apparently agree that this claim term is limited to the APP770 isoform of amyloid precursor protein. (Cotton Dec. Ex. L at 2; Ex. M at 1.) The parties also agree that the word "isolated" in the term should be defined as is indicated in the patent specification (i.e., "free of at least some of the contaminants associated with the nucleic acid or polypeptides occurring in a natural environment.") (Cotton Dec. Ex. A at 4:65-67.) The parties' dispute is over the term "encoding" – i.e., whether the term requires a nucleic acid that actually does <u>encode</u> APP770, as Plaintiffs believe, or whether the nucleic acid only needs to be <u>capable of encoding</u> APP770, as asserted by AIA.

Since the express language of the claim requires a "nucleic acid <u>encoding</u>" APP770 (Cotton Dec. Ex. A at 17:63-64), Plaintiffs' construction is the proper one. Plaintiffs' construction requires that the nucleic acid actually encode APP770, which is what the claim states. AIA's construction, on the other hand, improperly broadens the claim by requiring only that a nucleic acid be <u>capable of</u> encoding APP770. Many nucleic acids, with enough

modifications, could be capable of encoding APP770.  (Sisodia Dec. at ¶ 14.)  But the claim requires that the nucleic acid actually encode for APP770.  AIA did not claim a "nucleic acid *capable of* encoding" APP770, it claimed a "nucleic acid encoding" APP770.   As such, AIA should not be allowed to broaden the claim beyond its plain meaning.  Plaintiffs' construction should be adopted.

### b)  "an isolated fragment of said nucleic acid" – Claim 1 and dependent claims

Plaintiffs' proposed construction: **"**an isolated [as defined in the patent] and truncated or modified version of a nucleic acid encoding APP770.  *As used in the claim "an isolated fragment of said nucleic acid" does not include nucleic acids encoding APP isoforms other than APP770*.**"**

AIA's proposed construction: "Fragment" has the meaning as stated above. ["Fragment" means a part of a whole or a variation on a whole. When fragment refers to APP as a protein or polypeptide, a fragment of a protein or polypeptide can be, among other things, a part of the protein or polypeptide, such as a short sequence of amino acids from the protein or polypeptide, a truncated form, a modified form, or an isoform of the protein or polypeptide. *When fragment refers to a nucleic acid encoding for APP, a fragment of the nucleic acid can be,* among other things, a part of the nucleic acid, such as a short sequence of bases from the nucleic acid of at least the length claimed, or a nucleic acid encoding for a truncated form, a modified form, or *an isoform of the protein or polypeptide encoded by the nucleic acid. Such forms or isoforms are not limited to APP770.*] "Isolated" has the meaning stated above. ["Isolated" means free of at least some of the contaminants associated with the nucleic acid or polypeptides occurring in a natural environment.] Regarding "said nucleic acid," see also construction provided above in Item B. ["Item B" construction: "An isolated nucleic acid encoding human amyloid precursor protein 770" means a nucleic acid that is free of at least some of the contaminants associated with the nucleic acid or polypeptides occurring in a natural environment and that has a sequence that can encode for APP770.]

(Cotton Dec. Ex. L at 4, 1-3.)

The parties' dispute over this claim term is whether the term "fragment" can encompass a different APP isoform, as asserted by AIA.   The intrinsic evidence demonstrates that the term "fragment" does not include other isoforms, but rather means what it says – i.e., a "fragment" of APP770.

As an initial matter, the unambiguous claim language requires "an isolated *fragment of said nucleic acid*," where "said nucleic acid" refers back to the "nucleic acid encoding human amyloid precursor protein [APP] 770" recited earlier in the claim.  (Cotton Dec. Ex. A at 17:63-18:2.)  Moreover, in the patent specification, a "fragment" of an APP isoform is defined in the specification as a truncated or modified version of that isoform, and not as one of the different isoforms:

> "[F]ragment" can be a truncated ***APP isoform*** or a modified ***APP isoform*** (as by amino acid substitutions, deletions, or additions).  This definition recognizes that APP is a single gene that undergoes alternative splicing to generate several isoforms that are designated by the total number of amino acids in each. Thus, treatment includes various alternatively spliced exons resulting in isoforms of 770, 751, 714, 695, 563 and 365 amino acids.

(Cotton Dec. Ex. A at 5:33-40 (emphasis added).)

Plaintiffs' construction properly incorporates both of these ideas by defining a fragment of a nucleic acid encoding APP770 as a truncated or modified version of a nucleic acid encoding APP770.

Plaintiffs' construction is also consistent with the prosecution history of the patent. As demonstrated above, AIA initially sought much broader claims that did not limit the '169 patent to the APP770 isoform.  (Cotton Dec. Ex. D at 34-37.)  But the PTO repeatedly rejected AIA's efforts to obtain claims that would cover all APP isoforms.  (Cotton Dec. Exs. E - F.)  Finally, to obtain the '169 patent, AIA narrowed its claims to the APP770 isoform. (Cotton Dec. Exs. I - J.)

AIA cannot now argue that the '169 patent actually includes all APP isoforms, because to secure the '169 claims, AIA surrendered claims covering the other isoforms.  "It is a rule of patent construction consistently observed that a claim in a patent as allowed must

be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220 (1940). It is only fair that a patentee cannot construe its claims "one way in order to obtain allowance and in a different way against accused infringers." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008). Allowing the '169 patent to cover more than just the APP770 isoform would violate basic tenets of claim construction. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (explaining the doctrine of prosecution disclaimer, which "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution").

Accordingly, Plaintiffs' proposed construction is consistent with all the sources of intrinsic evidence. Moreover, Plaintiffs' construction is also consistent with how AIA has claimed its alleged discoveries in patents directly related to the '169 patent. As demonstrated above, after obtaining the '169 patent, AIA went back to the Patent Office to obtain the '963 patent. In that patent, AIA claimed all mutated APP isoforms in the context of a claim covering the actual proteins containing the Swedish mutation:

> 1. A purified and isolated ***polypeptide encoded by a nucleic acid which encodes a human amyloid precursor protein*** including the nucleotides encoding codon 670 and 671 of human amyloid precursor protein 770 (APP NO.), wherein the nucleic acid encodes an asparagine at codon 670 and/or a leucine at codon 671.

(Cotton Dec. Ex. B at 19:2-20:2 (emphasis added).)

In this claim, any of APP's several isoforms are covered, because the claim recites "a human amyloid precursor protein." In other words, because the claim is not limited to any particular APP isoforms, it includes all of the APP isoforms.

Similarly, in the related '448 patent, which AIA has not asserted in this case, AIA claimed nucleic acids encoding all mutated APP isoforms and fragments of those isoforms:

> 1. An isolated cell comprising ***a nucleic acid encoding human amyloid precursor protein including the nucleotides encoding codon 670 and 671 of human amyloid precursor protein 770, or encoding the codons corresponding to these in other isoforms of APP***, operably linked to a promoter, wherein the nucleic acid encodes an amino acid other than lysine at codon 670 and/or an amino acid other than methionine at codon 671 and, ***wherein the cell expresses a human amyloid precursor protein or fragment thereo***f which has an amino acid other than lysine at codon 670 and/or an amino acid other than methionine at codon 671.

(Cotton Dec. Ex. K at 17:57-66 (emphasis added).)

Again, as in the '963 patent, any of the mutated APP isoforms are covered by this claim because the nucleic acid need only encode the "human amyloid precursor protein" ("APP") with the Swedish mutation, and not any particular isoform.

As seen in these related patents, when AIA intended its claims to cover all APP isoforms, it drafted its claims accordingly, and did not claim other isoforms as "fragments" of APP770. AIA's construction is thus improper, because it works to substantially broaden the scope of the entire '169 patent beyond just APP770 by defining—contrary to the patent and the understanding of a person of skill in the art—each of the different APP isoforms as "a fragment of" APP770. (Cotton Dec. Ex. L at 4, 1-3) But each isoform is a unique protein with a unique sequence, and none of the isoforms can accurately be considered a fragment of APP770. (Sisodia Dec. at ¶ 11.)

Notably, AIA did not act as a "lexicographer" in the '169 patent and provide any indication in the specification that each of the APP isoforms should be considered a fragment of APP770. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)("[A]ny special definition given to a word must be clearly defined in the specification.") Rather, the patent specification states that a fragment of a particular APP isoform is a truncated or modified version of ***that particular isoform:***

> "[F]ragment" can be a truncated ***APP isoform*** or a modified ***APP isoform*** (as by amino acid substitutions, deletions, or additions). This definition recognizes that APP is a single gene that undergoes alternative splicing to generate several isoforms that are designated by the total number of amino acids in each. Thus, treatment includes various alternatively spliced exons resulting in isoforms of 770, 751, 714, 695, 563 and 365 amino acids.

(Cotton Dec. Ex. A at 5:33-40 (emphasis added).)

And, as demonstrated above, AIA's efforts to obtain claims that covered all the APP isoforms in the '169 patent were rejected. AIA should not be allowed to recapture through claim construction that which the claims clearly do not cover and that which it surrendered to the public. Plaintiffs' construction is consistent with all the sources of intrinsic evidence and should be adopted.

### c) "fragment thereof" – Claims 10-12

<u>Plaintiffs' proposed construction:</u> Same construction as proposed above, but specifying the minimum length of the fragment as required by independent claim 1 and applying the definition in context: "a truncated or modified version of an APP770 polypeptide ***comprised of at least three amino acids***. As used in the claim "fragment thereof" does not include APP isoforms other than APP770."

<u>AIA's proposed construction:</u> Same construction proposed for the term "fragment" above without specifying the minimum length required by independent claim 1 and without specifying the context.

The parties' primary dispute for this term is identical to the one discussed immediately above: namely, whether a "fragment" includes other APP isoforms besides APP770. Plaintiffs' incorporate their argument above with respect to this issue.

Additionally, however, it appears that AIA's proposed construction of "fragment" ignores the requirement in Claims 10-12 that the fragment of these claims have a particular minimum length: three amino acids. (Cotton Dec. Ex. L at 2-3.) The Court should include the particular fragment length to alleviate any potential confusion over the claims.

Claims 10-12 depend, in one fashion or another, on claim 1.[5] (Cotton Dec. Ex. A at 19:12-20:12.) In turn, claim 1 requires a nucleotide fragment that is at least 10 nucleotides long:

> 1. An isolated nucleic acid encoding human amyloid precursor protein 770 (APP No) including the nucleotides encoding codon 670 and 671 of human amyloid precursor protein 770, wherein the nucleic acid encodes asparagine at codon 670 and/or leucine at codon 671 or *an isolated fragment of said nucleic acid **having at least ten nucleotides*** and encoding at least positions 4 and 5 of SEQ ID NO:1.

(Cotton Dec. Ex. A at 17:63-18:2.)

As noted above, three nucleotides—i.e., a codon—encode a single amino acid. *See* Section II.B n.3 *supra*. Accordingly, a fragment that is at least ten nucleotides long will encode a polypeptide that is at least three amino acids long because the whole number resulting from dividing ten by three is three. (Sisodia Dec. at ¶ 7.) Claims 10-12 relate in one fashion or another to the polypeptide expressed by the, at minimum, 10-nucleotide

---

[5]     Claims 10-12 depend on claim 1 in different ways. Claim 10 depends on claim 9, which in turn depends on claim 1; claim 11 depends on claim 1; and claim 12 depends on claim 8, which in turn depends on claim 1. (Cotton Dec. Ex. A at 19:12-20:12.)

fragment of Claim 1.  Claims 10-12 thus require the polypeptide fragment to be at least three amino acids long.

Claim 1's "fragment" term does not require the construction to include any particular fragment length, because claim 1 explicitly recites the minimum fragment length.  Claims 10-12 then incorporate this length limitation by their dependency on Claim 1.  In order to avoid jury confusion over the issue, the Court should specify the fragment length of Claims 10-12, which is required by Claim 1, as opposed to not specifying it and requiring the above explanation to be elucidated at trial.

From AIA's interminable definition of "fragment," it is unclear whether AIA actually disagrees with the above.  To the extent it does, however, the requirement is clear.  Plaintiffs respectfully request that the Court include the fragment length in the definition of "fragment" for Claims 10, 11 and 12.

### d) "immortalized mammalian cell line" -- Claims 10-12

The parties' proposed construction: a type of mammalian cell that has the ability to indefinitely replicate in culture.

For this term, the parties were able to agree on the above construction, and respectfully request that the Court adopt it.

### e) "vector operable in a mammalian cell" – Claim 9

Plaintiffs' proposed construction: "virus or nucleic acid capable of functioning as a vehicle to deliver and allow expression of DNA in a mammalian cell"

AIA's proposed construction: "Vector" means a polynucleotide, or vehicle containing a polynucleotide (such as a virus or bacteriophage), capable of transferring a DNA or cDNA sequence of interest into a host cell, **and/or expressing a polypeptide** encoded by the DNA or cDNA sequence of interest in a host cell. "Operable in a mammalian cell" means that the vector continues to express RNA and/or protein in the mammalian cell.

The parties' dispute over the construction of this term amounts to a dispute over whether a vector—which is a special nucleic acid used by molecular biologists to deliver or transfer DNA—must be capable of operating as a vehicle to deliver DNA to a cell. (Cotton Dec. Ex. L at 4; Ex. M at 2-3.) Although both parties properly incorporate the idea that a vector is a vehicle into their constructions, AIA effectively excises this requirement from its construction by slipping in the word "or" into the phrase "and*/or* expressing a polypeptide," thereby meaning that the vector need not be capable of operating as a vehicle to deliver DNA to a cell. Plaintiffs' construction properly requires this well-understood capability, and AIA's failure to include the requirement improperly broadens AIA's claims.

Plaintiffs' construction is consistent with how a person of skill in the art would understand the term, as viewed in the context of both intrinsic and extrinsic evidence. Indeed, the specification repeatedly references vectors in a context that depicts vectors operating to deliver DNA to a cell:

- Alternatively, viral vectors, e.g., Adeno-associated virus, can be used to deliver the mutated gene to the stem cell. In addition, **such viral vectors *can be used to deliver the mutated gene to a developed animal and then used to screen.*** (Cotton Dec. Ex. A at 12:6-9.)

- **The vectors containing the DNA segments of interest (e.g., polypeptides encoding a variant APP polypeptide) *can be transferred into the host cell*** by well-known methods, which vary depending on the type of cellular host. (Cotton Dec. Ex. A at 16:49-53.)

- Vectors comprising the nucleic acids of the invention are also provided. **These vectors *can be placed in a host* capable of expressing the characteristic portion of human amyloid precursor protein.** (Cotton Dec. Ex. A at 4:7-10.)

Plaintiffs' construction is further supported by contemporaneous publications—including publications that AIA itself provided to Plaintiffs in the *Markman* process—that define a certain type of vector by referencing its ability to carry DNA:

> "Cloning vector is a plasmid or phage ***that is used to 'carry' inserted foreign DNA*** for the purposes of producing more material or a protein product." (Cotton Dec. Ex. O at 1238.)

Other publications from around the time AIA filed the '169 patent also consistently refer to vectors as vehicles to transmit DNA:

> "***A vector is a cloning vehicle*** which provides a suitable origin of replication necessary for production of foreign DNA." (Cotton Dec. Ex. Q at MYR000042.)

> "Vector – In cell biology, an agent (virus or plasmid) ***used to transmit genetic material*** to a cell or organism. (See also cloning vector.)" (Cotton Dec. Ex. P at MYR000061.)

AIA's proposed construction is yet another effort to broaden its claim by removing the requirement that a vector operate as a vehicle. This requirement is both recognized in the patent and well-understood in the art. Moreover, AIA's construction cannot be correct because it is fundamentally flawed. In particular, AIA's recitation of "bacteriophage" as a vector in the context of the claim is improper, because the claim is limited to vectors "operable in a mammalian cell." (Cotton Dec. Ex. A at 19:10-11.) But bacteriophage only operate in bacteria, and do not work in mammalian cells. (Sisodia Dec. at ¶ 15.) Plaintiffs' construction defines "vector" as it is well-understood in the art and should be adopted.

### 2. The '963 Patent

The parties dispute two limitations in the '963 patent's only claim. These limitations are underlined below:

1. A <u>purified</u> and isolated <u>polypeptide encoded by a nucleic acid which encodes a human amyloid precursor protein</u> including the nucleotides encoding codon 670 and 671 of human amyloid precursor protein 770 (APP NO.), wherein the nucleic acid encodes an asparagine at codon 670 and/or a leucine at codon 671.

(Cotton Dec. Ex. B at 19:2-20:2.)

### a) "purified"

<u>Plaintiffs' proposed construction</u>: **"**homogeneous preparation of a specific polypeptide"

<u>AIA's proposed construction</u>: "to materially separate from unwanted contaminants."

Plaintiffs' construction is the proper one, because it is consistent with how a person of skill in the art would understand "purified" in the context of the patent. Such a person would understand that a polypeptide is not "purified" if it is found in a heterogeneous (i.e., non-homogeneous) preparation containing other polypeptides or cell materials. (Sisodia Dec. at ¶ 16.) Such a heterogeneous preparation would contain a varied collection of proteins, none purified from the others, and could not accurately be described as a purified protein. (*Id.*) Accordingly, a protein is not purified unless it is a homogeneous preparation.

The specification comports with this understanding through its express discussion of the term "purified" in relation to protein purification. Importantly, the purification process discussed ("affinity chromatography") is one that would result in a homogeneous preparation of a protein:

Murine immunoglobulins which bind the recombinant fragment with a binding affinity of at least $1 \times 10^{-7}$ m-1 ***can be harvested from the immunized mouse as an antiserum, and may be further purified by affinity chromatography or other means.***

(Sisodia Dec. at ¶ 17 referring to Cotton Dec. Ex. B at 15:49-53 (emphasis added).)

Plaintiffs' construction is also consistent with contemporaneous publications discussing protein purification. A reference from when the patent was filed in 1992 discusses protein purification, and expressly states that a purified protein is one that contains "a single species," or in other words a homogeneous preparation of a specific protein:

> A protein is totally pure only when it is known to contain ***only a single species*** uncontaminated with salts or adventitious water. (Cotton Decl. Ex. R.)

AIA's construction for "purified" is improper, because it does little more than repeat the patent's definition of "isolated," which accounts for the removal of contaminants (Cotton Dec. Ex. B at 5:4-6), just like AIA's construction for "purified." (Cotton Dec. Ex. L at 4). And since the claim requires a polypeptide that is "purified ***and isolated***," AIA's construction reads "purified" out of the claim. (Cotton Dec. Ex. B at 19:2.) Simply put, when AIA's construction for "purified" and the patent's definition for "isolated" are read into the claim, it becomes a claim to a polypeptide "<u>materially separate from unwanted contaminants</u>" (purified) and "<u>free of at least some of the contaminants</u> associated with the nucleic acid or polypeptides occurring in a natural environment" (isolated). (Cotton Dec. Ex. B at 5:4-6.) As such, AIA's proposed construction voids "purified" of any meaning, and violates the claim construction principle that presumes each word in a claim is present for a reason. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d at 950-51.

AIA's proposed construction is also improper because it is indefinite. Indeed, it relies on a purely subjective metric: Who determines whether a contaminant is unwanted or wanted? Under AIA's construction, the claim scope varies with the subjective desire of an individual purifying the polypeptide. Two individuals could make identical preparations of

proteins, and one would infringe while the other would not, depending on what the two individuals <u>wanted</u> to be in their respective test tubes.  Accordingly, AIA's construction fails to provide any notice of the claim's scope, which renders the construction impermissibly indefinite.  *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) ("[O]ne of skill would not know from one [situation] to the next whether a particular composition standing alone is within the claim scope or not.  That is the epitome of indefiniteness.")

For all of these reasons, Plaintiffs' proposed construction should be adopted over AIA's redundant and indefinite one.

### b) "polypeptide encoded by a nucleic acid which encodes a human amyloid precursor protein"

<u>Plaintiffs' proposed construction:</u> any one of the isoforms of the human amyloid precursor protein

<u>AIA's proposed construction:</u> a polypeptide that was expressed by a nucleic acid encoding human amyloid precursor protein.

As discussed above in Section II.B, this term calls for a polypeptide encoded by a nucleic acid encoding any one of the APP isoforms.  (Cotton Dec. Ex. B at 19:2-20:2.)  Accordingly, both parties' constructions properly include all of the APP isoforms.  Where the parties differ on their constructions is on the issue of whether the term includes "fragments" of APP.  Although AIA's construction does not recite "fragment," AIA's construction appears to include fragments because, in its infringement contentions provided to plaintiffs' in this case, AIA has alleged that Aß—a fragment of APP—is covered by this claim.  (Cotton Dec. Ex. S at 3-4.)

Plaintiffs' construction is proper, because it is based on the unambiguous claim language, which does not include fragments. The claim calls for a full-length APP polypeptide encoded by a full-length APP nucleic acid. Nothing in the claim suggests otherwise. Accordingly, fragments are not included in the scope of the claim, and construing the claim to include fragments improperly broadens it.

Indeed, when AIA intended its claims to cover fragments, AIA expressly used the word "fragment." As discussed at length above, AIA regularly claimed "fragments" of APP in related patent claims. (*See e.g.*, Cotton Dec. at Ex. A at 17:63-18:2; 20:1-5.) AIA's recitation of "fragment" in related claims demonstrates that AIA's failure to recite "fragment" in this claim results in a claim that only covers full-length APP. *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) ("Because NTP's patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.").

Accordingly, to the extent AIA is reading "fragments" into Claim 1 of the '963 patent—and it appears that is the case—the clear claim language does not support such a construction. Plaintiffs' construction should be adopted.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny each one of AIA's proposed constructions in favor of Plaintiffs' proposed constructions.

Respectfully submitted,

Dated:  June 24, 2009

By:  s/Sara Cotton
    Michael E. Florey (*pro hac vice*)
    Jonathan E. Singer (*pro hac vice*)
    Thomas S. McClenahan (*pro hac vice*)
    Sara Cotton (*pro hac vice*)
    Elizabeth Flanagan (*pro hac vice*)
    FISH & RICHARDSON P.C.
    3200 RBC Plaza
    60 South 6th Street
    Minneapolis, MN 55402
    Telephone:  (612) 335-5070
    Facsimile:  (612) 288-9696
    florey@fr.com
    singer@fr.com
    mcclenahan@fr.com
    cotton@fr.com
    eflanagan@fr.com


    Michael L. Chapman
    Florida Bar No. 843555
    HOLLAND & KNIGHT LLP
    100 North Tampa Street, Suite 4100
    Tampa, FL 33602-3644
    Telephone:  (813) 227-8500
    Facsimile:  (813) 229-0134
    michael.chapman@hklaw.com

*Attorneys for Plaintiffs/Counter-Defendants*
*MAYO CLINIC JACKSONVILLE,*
*MAYO FOUNDATION FOR MEDICAL*
*EDUCATION AND RESEARCH,*
*MYRIAD GENETICS, INC., and*
*MYRIAD PHARMACEUTICALS, INC.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 24, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

s/ Sara Cotton
Sara Cotton

60580362.doc