IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| MAYO CLINIC JACKSONVILLE, et al, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 8:05-cv-639-T23-TBM |
| | ) | Case No. 8:05-cv-1049-T23-TBM |
| ALZHEIMER'S INSTITUTE OF AMERICA, | ) | |
| INC., | ) | |
| Defendant. | ) | |

**DEFENDANT AIA'S MEMORANDUM IN SUPPORT OF
<u>ITS PROPOSED CLAIM CONSTRUCTION</u>**

### TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ..................................................................................................2

    **A.**   Protein Synthesis Generally.................................................................2

    **B.**   Summary of the Invention ....................................................................5

    **C.**   The Claims..............................................................................................8

    **D.**   Case History............................................................................................9

III.  CLAIM CONSTRUCTION.................................................................................10

    **A.**   Canons of Claim Construction.............................................................10

    **B.**   Meaning of the Terms in the Present Claims.......................................12

        1.   "An isolated nucleic acid encoding human amyloid precursor
            protein 770 (APP No)"  & "an isolated fragment of said nucleic
            acid"  & "fragment"/"fragment thereof".......................................12

        2.   "vector operable in a mammalian cell"........................................20

        3.   "immortalized mammalian cell line" ...........................................21

        4.   "purified" .....................................................................................21

        5.   "polypeptide encoded by a nucleic acid which encodes a human
            amyloid precursor protein" .........................................................22

IV.   CONCLUSION...................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Markman v. Westview Instruments*, 517 U.S. 370 (1996) ........................................................ 1, 10

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ................................................. 10, 11, 14

Defendant Alzheimer's Institute of America, Inc. ("AIA") respectfully submits this

*Markman{* TA \l "*Markman v. Westview Instruments*, 517 U.S. 370 (1996)" \s "Markman" \c 1 *}*

brief in support of its proposed construction of the claims of United States Patent Nos. 5,455,169

(the "'169 Patent ") and 5,795,963 (the "'963 Patent").

## I.    INTRODUCTION

While AIA will describe the patents at issue in more detail later in this memorandum, two

things are clear from even a layperson's first reading of those patents: 1) the '169 Patent extends

to a genetic mutation as it occurs in ***multiple different-length variations*** of the nucleic acid that

produces the human amyloid precursor protein; and 2) the '963 Patent extends to the same

mutation as it occurs in ***multiple different-length variations***, or isoforms, of the human amyloid

precursor protein itself.  Indeed, as just one example, the patents expressly state that "treatment

includes various alternatively spliced exons resulting in [human amyloid precursor protein]

isoforms of 770, 751, 714, 695, 563 and 365 amino acids."

Yet, in a transparent effort to avoid a finding of infringement, plaintiffs Mayo Clinic of

Jacksonville, Mayo Foundation for Medical Education and Research (together, "Mayo"), Myriad

Genetics, Inc., and Myriad Pharmaceuticals, Inc.'s (together, "Myriad") (collectively, "Mayo and

Myriad" or "Plaintiffs") have proposed claims constructions that would limit the patents to a

nucleic acid producing only a single variation of the human amyloid precursor protein.  As is

already clear, however, Mayo and Myriad must ignore the plain language of the patents in order

to so limit them.  Despite these distortions, their motives are transparent—the single variation to

which Mayo and Myriad artificially limit the patent (770) is a variation they have not used.

AIA's proposed constructions, on the other hand, simply reflect the scope of the patents

as explained in detail in the claims themselves, as well as the specification.  Because the intrinsic

1

evidence fully supports AIA's proposed constructions—and rejects Mayo and Myriad's constructions—AIA respectfully requests that the Court adopt its constructions.

## II.     BACKGROUND

Although the patents at issue in this case reflect advances relating to Alzheimer's Disease, the underlying science involves protein synthesis, which is the process by which cells build proteins. An explanation of protein synthesis, the specific invention of the patents at issue, and the case history in this action follows below.

### A.     Protein Synthesis Generally

Cells contain two types of nucleic acid: deoxyribonucleic acid (DNA) and ribonucleic acid (RNA). *See* Declaration of Travis W. McCallon ("McCallon Decl."), Ex. 1 at pp. 13-14. DNA is found in the cell nucleus, while RNA is found in both the cytoplasm and the nucleus. Nucleotides are the building blocks of these nucleic acids, and contain a phosphate group, a sugar moiety, and a base group. In DNA, there are four different types of nucleotide base groups: adenine (A), thymine (T), guanine (G), and cytosine (C). While both DNA and RNA are made of long chains of linked nucleotides (polynucleotide chains), DNA contains *two* intertwined polynucleotide chains (the double helix). *Id.*, Ex. 1 at pp. 21-22. The two chains are hydrogen-bonded together through the nucleotide base groups. In this bond, the base group adenine pairs only with thymine (A=T, T=A), and guanine pairs only with cytosine (G=C, C=G). Thus, the opposing sequences in the two polynucleotide chains are said to be complementary.



During protein synthesis, the double helix of DNA "unzips" and the genetic information from a single-stranded region of DNA—the nucleotide sequence—is transferred to RNA through the creation of a complementary RNA strand. The four nucleotide base groups in RNA are the same as those found in DNA, except uracil (U) replaces thymine and pairs with adenine. McCallon Decl., Ex. 1 at p. 36. This process of forming RNA from a DNA template is called transcription.



3

At this stage, the nucleotides along the RNA strand are categorized as either introns or exons. Generally speaking, exons comprise the coding regions of the RNA strand that serve as templates to order amino acids. Introns do not code for amino acids. McCallon Decl., Ex. 1 at p. 137. As the RNA (or, more specifically, messenger RNA (mRNA)) matures, the introns and, potentially, some of the exons, are cut out of the strand. This variable process is called alternative splicing. *See id.*, Ex. 1 at p. 137. Once the mRNA strand consists only of coding exons, translation can begin.

Translation begins when the complementary mRNA strand moves into the cytoplasm. mRNA nucleotides grouped together in threes, called codons, each code for—or signify—a different amino acid.[1] McCallon Decl., Ex. 1 at p. 36. Codons can be identified according to their position along the mRNA strand—*e.g.*, the first combination of three nucleotides corresponds to codon 1. A cytoplasmic particle (cellular organelle or macromolecule) called a ribosome moves along the mRNA strand so that successive codons are read for ordering their respective amino acids. *Id.*, Ex. 1 at pp. 38-39. Amino acids are then chemically linked to form polypeptides and, eventually, proteins.

---

[1] There are twenty different amino acids, although there are 64 possible codon combinations (four different nucleotide bases, ordered in sets of three—4 x 4 x 4=64). *See* McCallon Decl., Ex. 1 at p. 36.

4



After a protein is translated, it may be structurally or chemically modified in order to alter or expand its functions. Enzymes, for example, may modify the structure of a protein by removing amino acids from the end of the polypeptide chain or cutting it in the middle.

**B.    Summary of the Invention**

The present invention relates to the discovery of a nucleic acid mutation that ultimately results in the development of Alzheimer's Disease (AD). AD is characterized by two types of lesions in the brain, called senile plaques and neurofibrillary tangles. Both senile plaques and neurofibrillary tangles contain harmful deposits of amyloid protein, the major protein subunit of which is β-amyloid protein (Aβ). Aβ, in turn, is a cleavage product of a much larger precursor protein called amyloid precursor protein (APP). McCallon Decl., Ex. 2 at col. 1, ll. 21-36.

APP, like other proteins, is generated through the natural synthesis process described above, and is thought to assist in synapse formation and repair. In the human body there is only one APP-encoding nucleic acid sequence. The full length APP-encoding sequence is capable of

5

producing a protein with 770 amino acids, which is the longest APP isoform (APP770). But this single APP sequence, or gene, is alternatively spliced during the naturally occurring protein synthesis process. This splicing may, and often does, result in a template for various other APP isoforms, each consisting of a different number of amino acids. *See* McCallon Decl., Ex. 2 at col. 5, ll. 35-38. Smaller APP isoforms resulting from variable alternative splicing of the APP gene contain 365, 563, 695, 714, and 751 amino acids, respectively. *Id.*, Ex. 2 at col. 5, ll. 40.

The creation of pathogenic Aβ—and thus the potential development of AD—is the result of atypical processing of APP in the body. McCallon Decl., Ex. 2 at col. 2, ll. 1-2. More specifically, in some cases of familial AD an incorrect nucleotide base group substitution occurs in part of the APP-encoding nucleic acid. The substitution of an incorrect base group in the APP sequence results in a codon that codes for an incorrect amino acid. *See id.*, Ex. 2 at col. 2, ll. 38-47. The present invention is based upon the discovery of this mutation as it occurs at specifically identified codon positions and sequences along the APP-encoding nucleic acid.

This mutation subsequently affects the way the protein is cut, or cleaved, by enzymes. Enzymes that cut APP are known as secretases, and the two enzymes that initially compete to cut APP are alpha-secretase and beta-secretase. If APP is first cut by beta-secretase, it can be further cut by a third enzyme, gamma-secretase, to form a peptide with 42 amino acids (A$\beta_{42}$), which eventually clumps together to form AD-inducing deposits. The mutation of the present invention (i.e., the substitution of an incorrect base group in the APP sequence that ultimately results in an incorrect amino acid) causes enzymes to cut APP at positions that result in increased amounts of A$\beta_{42}$.



The '169 Patent, then, is directed in part to an isolated nucleic acid that provides a template for APP and that encodes for incorrect amino acids—specifically, asparagine and/or leucine—at specific positions along the APP chain.  These specific positions are the 670th and 671st codons in a nucleic acid encoding for APP770, and the corresponding positional codons in nucleic acids encoding for APP isoforms other than APP770.  McCallon Decl., Ex. 2 at col. 5, ll. 30-53.  Located at these positions, this genetic mutation is known as the "Swedish mutation." The '169 Patent also covers isolated nucleic acid fragments, so long as the fragments include the Swedish mutation.  These fragments include not only nucleic acids encoding for the other APP isoforms less than 770, but also nucleic acids encoding for even smaller forms, including polypeptides with as few as 8 amino acids.  The related '963 patent is directed to the actual mutated polypeptide strand created by a nucleic acid described by the '169 patent.

7

By isolating these nucleic acids and resulting polypeptides, the present invention, among other things, provides an experimental model of AD that is valuable in further ascertaining the biochemical events leading to AD and developing and screening agents that inhibit, prevent, or reverse the progression of AD.

### C.    The Claims

Representative claims 1, 9, and 11 of the '169 Patent appear below.

> 1.   An isolated nucleic acid encoding human amyloid precursor protein 770 (APP No) including the nucleotides encoding codon 670 and 671 of human amyloid precursor protein 770, wherein the nucleic acid encodes asparagine at codon 670 and/or leucine at codon 671 or an isolated fragment of said nucleic acid having at least ten nucleotides and encoding at least positions 4 and 5 of SEQ ID NO:1.

McCallon Decl., Ex. 2 at col. 17, l. 63 – col. 18, l. 2.

> 9.   A vector operable in a mammalian cell line comprising the nucleic acid or fragment of claim 1.

*Id.*, Ex. 2 at col. 19, ll. 10-11.

> 11.   An immortalized mammalian cell line containing the nucleic acid of claim 1, which expresses a human amyloid precursor protein or fragment thereof having asparagine at codon 670 and/or leucine at codon 671.

*Id.*, Ex. 2 at col. 20, ll. 1-5.

Claim 1 of the '963 Patent, the only claim of that patent, reads as follows:

> 1.   A purified and isolated polypeptide encoded by a nucleic acid which encodes a human amyloid precursor protein including the nucleotides encoding codon 670 and 671 of human amyloid precursor protein 770 (APP NO.) wherein the nucleic acid encodes an asparagine at codon 670 and/or leucine at codon 671.

*Id.*, Ex. 3 at col. 19, l. 2 – col. 20, l. 2.

8

### D.    Case History

There is no dispute that Mayo and Myriad have used cell lines containing the Swedish mutation.  More specifically, Mayo and Myriad's cell lines contain the mutation as it occurs within a nucleic acid encoding for the APP isoform with 695 amino acids (APP695).  Mayo had previously obtained a license from AIA to use the Swedish mutation—as it occurs in APP695— in Tg2576 mice.  Mayo at the time expressly recognized that the license did not extend to the Swedish mutation as it occurs in cell lines and, as such, affirmatively sought to extend its license from AIA to cover cell lines.  *See* Dkt. No. 60-1, at pp. 3-4.  Mayo then decided not to obtain a license for the mutation as it occurs in cell lines, but it and Myriad nevertheless proceeded to make significant use of cell lines with the mutation.  After discovering this unauthorized use, AIA brought a patent infringement suit in the District Court for the District of Kansas.  That case was transferred to this Court when Mayo and Myriad subsequently sought to compel arbitration based upon the prior license agreement.  This Court then ordered arbitration, and stayed the patent infringement litigation.

In the arbitration, Mayo argued that its prior license for Tg2576 mice extended to cell lines containing the Swedish mutation, despite that it had already recognized a need to expand that license to cover cell lines.  The arbitrator saw through that transparent argument, and ruled that the prior license did not extend to the cell lines that Mayo and Myriad used.  This Court entered the arbitrator's order, and has since lifted the stay of the patent infringement proceedings.

With the license agreement no longer available as a defense to patent infringement, Mayo and Myriad have now identified another, equally transparent, argument to employ in an attempt to avoid a negative finding concerning what they themselves long ago recognized as

infringement.[2]  They now allege that AIA's patents do not cover the Swedish mutation as it occurs in the nucleic acid encoding for the APP695 isoform, despite the fact that Mayo previously paid AIA a substantial amount of money to license the mutation *in the nucleic acid encoding for the APP695 isoform*.  Nevertheless, they argue that the patents cover the Swedish mutation as it occurs only in the nucleic acid encoding for the APP770 isoform.  To further this argument, Mayo and Myriad not only have contradicted their own prior actions but have proposed claims constructions that are directly at odds with the patent language and the expressed intention of the inventor of the patents at issue.

## III.    CLAIM CONSTRUCTION

### A.    Canons of Claim Construction

In *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996){ TA \s "Markman" }, the Supreme Court ruled that "construction of a patent, including terms of art within its claim, is exclusively within the province of the court."  The Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005){ TA \l "*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)" \s "Phillips" \c 1 }, in turn, comprehensively sets forth the currently controlling claim construction principles.

As the *Phillips{ TA \s "Phillips" }* court confirmed, the claims of a patent define the patentee's invention, and claim terms are generally given their ordinary and customary meaning. 415 F.3d at 1312.  The ordinary and customary meaning of a patent claim term, however, is the meaning that the term would have to a person of ordinary skill in the relevant art at the time of the filing of the patent application.  *Id.* at 1313.

The person of ordinary skill is deemed to read a claim term in the context of both the claims and the entire patent as a whole, including the specification.  *Phillips{ TA \s "Phillips" },*

---

[2] AIA plans to file a motion for summary judgment of literal infringement in the coming weeks.

415 F.3d at 1313.  Thus, the context in which a term is used within the relevant claim can be instructive, and viewing the relevant claim against the other claims of the patent is also helpful. *Id.* at 1314.  The specification also "necessarily informs the proper construction of the claims," however.  *Id.* at 1316.  Indeed, the Federal Circuit has explained that the specification is the "best source" for understanding a disputed or technical term.  *Id.* at 1315.  And in considering the specification, courts should specifically look for instances in which the inventor has expressly defined a term used in the claims, as "the inventor's lexicography governs."  *Id.*  In addition to considering the claims and the specification, courts may also consult the patent's prosecution history, which can reveal how the inventor and the PTO understood the patent.  *Id.* at 1317.  Because the prosecution history represents only an ongoing negotiation, however, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.*

Together the claims, specification, and prosecution history comprise the intrinsic evidence, which the Federal Circuit regards as the most important category of evidence in ascertaining the meaning of claim terms.

The Federal Circuit has also authorized courts to rely on certain extrinsic evidence, although it has explained that such evidence is less significant and less reliable than the intrinsic record.  *Phillips{ TA \s "Phillips" }*, 415 F.3d at 1317.  It has especially noted that technical dictionaries and treatises may provide an understanding of the technology at issue and the manner in which one of ordinary skill might use a term.  *Id.* at 1318.  Courts also may consider expert testimony in certain circumstances, but the Federal Circuit has cautioned that unsupported assertions by experts are not useful and that testimony that is at odds with the intrinsic evidence should be discounted.  *Id.*

11

With these principles in mind, AIA turns to the specific terms and phrases that are in dispute in this case.

### B.    Meaning of the Terms in the Present Claims

    1.    <u>"An isolated nucleic acid encoding human amyloid precursor protein 770 (APP No)"</u>
                    <u>&</u>
        <u>"an isolated fragment of said nucleic acid"</u>
                    <u>&</u>
        <u>"fragment"/"fragment thereof"</u>

The phrases, "An isolated nucleic acid encoding human amyloid precursor protein 770 (APP No)" and "an isolated fragment of said nucleic acid" both appear in claim 1 of the '169 Patent. "Fragment" or "fragment thereof" appear in claims 1-3 and 9-12 of the '169 Patent. Given the nature of an APP-encoding nucleic acid and the protein synthesis process based upon such a nucleic acid, AIA submits that these three phrases/terms are best addressed together. Indeed, the dispute between the parties as to all three phrases/terms turns on the same issue. AIA contends that through these phrases/terms the applicable claims of the '169 Patent extend to isolated nucleic acids that encode both APP770 as well as other APP forms and isoforms. Mayo and Myriad, on the other hand, contend that the applicable claims of the '169 Patent extend to a nucleic acid that encodes only APP770. As explained below, the intrinsic and extrinsic evidence not only supports AIA's constructions, it unequivocally refutes Mayo and Myriad's constructions.

The parties have proposed the following constructions for the first of the disputed phrases in claim 1:

| Limitation ('169 Patent, Claim 1) | AIA's Construction | Mayo and Myriad's Expected Construction[3] |
|---|---|---|
| An isolated nucleic acid | A nucleic acid free of at least | A nucleic acid free of at least |

---

[3] Although the parties have exchanged proposed claims constructions, they have also agreed to allow each other to modify those proposed constructions as necessary.

| | | |
|---|---|---|
| encoding human amyloid precursor protein 770 (APP No) | some of the contaminants associated with the nucleic acid occurring in a natural environment, and that has a sequence that can encode for APP770, as well as all other APP forms and isoforms | some of the contaminants associated with the nucleic acid occurring in a natural environment, and that encodes the APP 770 isoform of the human amyloid precursor protein |

As an initial matter, this disputed phrase includes the term "isolated," which the patents specifically define as "free of at least some of the contaminants associated with the nucleic acid or polypeptides occurring in a natural environment." *See e.g.* McCallon Decl., Ex. 2 at col. 4, ll. 65-67. The parties appear to agree that this should be the meaning given to "isolated" as it appears here and throughout both the '169 and '963 Patents.

Turning to the disputed phrase as a whole, AIA's construction—through the "sequence that can encode" language—merely reflects the fact that there is only one APP nucleotide sequence, or gene. Thus, a nucleic acid that can encode for APP770 (the longest APP isoform) necessarily includes within it sequences that encode for all other APP isoforms, including, for example, APP695. Indeed, the '169 Patent expressly states in the specification that "APP is a single gene that undergoes alternative splicing to generate several isoforms." McCallon Decl., Ex. 2 at col. 5, ll. 35-37. Mayo and Myriad's proposed construction, especially when read in conjunction with its proposed construction of "an isolated fragment of said nucleic acid," at least implicitly fails to recognize this fact.

Two key facts from the intrinsic record support the conclusion that "nucleic acid encoding human amyloid precursor protein 770" is meant to encompass all APP-encoding sequences. First, the '169 patent specifically defines "codon 670 and/or codon 671," which in claim 1 are terms that follow and modify "An isolated nucleic acid encoding human amyloid precursor protein 770":

13

> 1.  An isolated nucleic acid encoding human amyloid precursor protein 770 (APP No) including the nucleotides encoding **codon 670 and 671** of human amyloid precursor protein 770, wherein the nucleic acid encodes asparagine at **codon 670 and/or leucine at codon 671** . . . .

McCallon Decl., Ex. 2 at col. 17, ll. 63-67.  As the '169 specification dictates, codon 670 and/or codon 671 "refers to the codons (i.e., the tri-nucleotide sequence) that encode the 670th and 671st amino acid positions in APP770, **or the amino acid position in an APP fragment that corresponds to the 670th or 671st positions in APP770**." *Id.*, Ex. 2 at col. 5, ll. 41-45 (emphasis added).  Thus, the specification continues, "codon 670 refers to the codon that encodes the 651st amino acid residue of APP751 and the 595th amino acid residue of APP695." *Id.*, Ex. 2 at col. 5, ll. 49-51.

Because "codon 670" and "codon 671" are positional references that the inventor expressly intended to apply to nucleic acids encoding APP770 and other APP isoforms, the "nucleic acid encoding human amyloid precursor protein 770" must necessarily include the sequence for APP770 as well as all other APP isoforms.   And, indeed, the nucleic acid that encodes for APP770 in fact encompasses all of the shorter APP isoform sequences, as explained above.

Second, claim 7 of the '169 patent, which depends from claim 1, is specifically directed to a nucleic acid that encodes only the APP770 isoform:

> 7.  The isolated nucleic acid of claim 1, wherein the nucleic acid encodes the **entire** human amyloid precursor protein 770.

McCallon Decl., Ex. 2 at col. 19, ll. 4-6 (emphasis added).  Because dependent claim 7 is directed to a nucleic acid that encodes only the APP770 isoform, independent claim 1 cannot be limited to that same scope.  As the court in *Phillips{ TA \s "Phillips" }* explained, "the presence

14

of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  415 F.3d at 1315.  Here, claim 7 adds to claim 1 the limitation that the nucleic acid **must encode only the APP770 isoform**. Since claim 7 must further limit clam 1, this limitation cannot be present in claim 1.  AIA's construction that the nucleic acid of claim 1 **can encode** for APP770, as well as other APP isoforms, is thus entirely consistent with the intrinsic evidence and controlling claim construction principles.

The prosecution history of the '169 patent also is consistent with AIA's construction. The phrase at issue was amended during prosecution from "An isolated nucleic acid characteristic of human amyloid precursor protein" to "An isolated nucleic acid encoding human amyloid precursor protein 770 (APP No)."  *See* McCallon Decl., Ex. 5 at pp. 1-2; Ex. 6 at p. 3. This was merely a clarifying amendment, and did not change the meaning or scope of the claim. As an initial matter, claim 1 prior to the amendment already included reference to APP770 elsewhere in its language.[4]  Moreover, the inventor in the specification expressly defined the pre-amendment language ("nucleic acid characteristic of human amyloid precursor protein") by reference to "human amyloid precursor protein 770."  *Id.*, Ex. 2 at col. 5, ll. 1-6.  As such, the addition of "770" merely made express in the claim what was already express in the specification.[5]  Indeed, if the addition of "770" had limited claim 1, the examiner would not have allowed claim 7 in its current form.

---

[4] The claim described, and continues to describe,  an "isolated nucleic acid . . . including the nucleotides encoding codon 670 and 671 **of human amyloid precursor protein 770** . . . ."  McCallon Decl., Ex. 5 at pp. 1-2 (emphasis added).

[5] The addition of "(APP No)" to claim 1 appears to have been a transcription error.  The examiner's handwritten notes indicate that the addition should have been "(APP 770)," though the "770" looks somewhat like "No."  *See* McCallon Decl., Ex. 5 at p. 1.

In addition, the examiner accompanied the "770" examiner's amendment with a notice of allowance in which he stated that "the prior art of record does not teach or suggest the claimed nucleic acid . . . because there is no suggestion in the prior art of record that nucleic acid encoding APP forms having asparagine at position 670 and/or leucine at position 671 exists or would be obvious to make."  McCallon Decl., Ex. 6 at pp. 3-4.  The examiner would not have referenced the plural "APP form**s**" if he viewed the claims as limited to only a nucleic acid encoding a single APP770 isoform.

Turning to the second of the disputed phrases in claim 1, the parties have proposed the following constructions:

| Limitation ('169 Patent, Claim 1) | AIA's Construction | Mayo and Myriad's Expected Construction |
|---|---|---|
| an isolated fragment of said nucleic acid | A nucleic acid free of at least some of the contaminants associated with the nucleic acid occurring in a natural environment, and that encodes for a truncated APP isoform, a modified APP isoform, or other APP form.  Such forms and isoforms are not limited to APP770. | an isolated [as defined in the patent] and truncated or modified version of a nucleic acid encoding APP 770.  As used in the claim "an isolated fragment of said nucleic acid" does not include nucleic acids encoding APP isoforms other than APP 770. |

Here again, AIA's construction merely reflects the fact that claim 1 extends to a nucleic acid that encodes APP770 as well as other APP forms and isoforms.  Mayo and Myriad's contrary construction flies directly in the face of the intrinsic record.  The specification, in fact, expressly states that "'fragment' can be a truncated APP isoform or a modified APP isoform (as by amino acid substitutions, deletions, or additions)."  McCallon Decl., Ex. 2 at col. 5, ll. 33-35.

Although this patent definition for "fragment" is phrased in terms of an APP protein itself, and "fragment" in claim 1 refers to a nucleic acid, AIA submits that the patent definition adaptively applies to both nucleic acids and proteins.  For example, in the context of a nucleic

16

acid, "fragment" is simply *a part of a nucleic acid encoding for* "a truncated APP isoform or a modified APP isoform," or other APP form.  Indeed, the patent clearly evidences that the claimed nucleic acid "fragment" of claim 1 is capable of encoding APP isoforms other than 770.  After defining "fragment," the specification declares that "treatment includes various alternatively spliced exons resulting in isoforms of 770, 751, 714, 695, 563 and 365 amino acids"—a plain reference to nucleic acids (which contain exons) that ultimately result in any of the various APP isoforms.  McCallon Decl., Ex. 2 at col. 5, ll. 38-40; *see also id.*, Ex. 2 at col. 15, ll. 47-52 ("The nucleic acid sequences of the present invention capable of ultimately expressing the desired variant APP polypeptides can be formed from a variety of different polynucleotides (genomic or cDNA, RNA, synthetic oligonucleotides, etc.) . . . .").  The patent could not be more clear as to its scope.

The "isolated fragment of said nucleic acid" limitation of claim 1, when viewed in its full context, also provides a positional reference for codons encoding asparagine and leucine in nucleic acid sequences shorter in length than those encoding for other recognized APP isoforms (these shorter sequences are often simply called "forms"):

> 1.  . . . an isolated fragment of said nucleic acid having at least ten nucleotides and encoding at least positions 4 and 5 of SEQ ID NO:1.

McCallon Decl., Ex. 2 at col. 17, l. 67 – col. 18, l. 2.  The patent identifies "SEQ ID NO: 1" in the specification in terms of a polypeptide that includes at least 8 amino acids, wherein two positions—positions four and five—contain the Swedish mutation.  *See id.*, Ex. 2 at col. 5, ll. 18-30.  Claim 1 requires at least ten nucleotides, which (when considering that codons are made up of three nucleotides) is a number of nucleotides sufficient to encode for these two amino acid positions.  Claim 1 also allows for nucleic acids with 24 nucleotides, which is the number of

17

nucleotides necessary to encode for a polypeptide with 8 amino acids. In a nucleic acid fragment with ten (or even 24) nucleotides, however, it would not be possible to locate the mutation's proper codon location through the codon 670 and/or codon 671 positional reference, which is why the patent identifies and claims the "SEQ ID NO: 1" positional reference, as well. The very fact that claim 1 expressly encompasses even these smaller forms and positional references also refutes Mayo and Myriad's proposed construction.

It is also worth noting that because the nucleic acid first identified in claim 1—through the "isolated nucleic acid encoding human amyloid precursor protein 770" limitation—is capable of encoding for all of the APP isoforms, an "isolated fragment of said nucleic acid" need not be derived by actually fragmenting a nucleic acid that at one time encoded for the APP770 isoform specifically. Rather, because the nucleic acid first identified in claim 1 encompasses the universal template for APP, an "isolated fragment of said nucleic acid" is simply any part of an APP-encoding nucleic acid, so long as it encodes "at least positions 4 and 5 of SEQ ID NO:1."

Moving to the final disputed term with respect to this issue, "fragment" appears in claims 1-3 and 9-12 of the '169 Patent. Mayo and Myriad suggest a different, stand-alone construction for "fragment" despite that term's appearance in the disputed claim 1 phrase discussed above. Not surprisingly, their construction again contradicts the defined meaning of the term as stated in the patent.

| Limitation ('169 Patent, Claims 1-3, 9-12) | AIA's Construction | Mayo and Myriad's Expected Construction |
|---|---|---|
| fragment/fragment thereof | When referring to a nucleic acid: a nucleic acid encoding for a truncated APP isoform, a modified APP isoform, or other APP form. When referring to a polypeptide or protein: a | a truncated or modified version of an APP770 polypeptide comprised of at least three amino acids. As used in the claim "fragment thereof" does not include APP isoforms other |

| | truncated APP isoform, a modified APP isoform, or other APP form. | than APP770. |
|---|---|---|

As explained above, the '169 patent specification expressly states that "'fragment' can be a truncated APP isoform or a modified APP isoform (as by amino acid substitutions, deletions, or additions)." McCallon Decl., Ex. 2 at col. 5, ll. 33-35. In addition, because claim 1 extends to nucleic acid sequences shorter in length than other recognized APP isoforms, "fragment" similarly extends to "other APP forms," as well. Indeed, in yet another reference, the patent makes clear that the claimed nucleic acids can encode for a wide range of isoforms and forms (so long as the Swedish mutation is present):

> Likewise, polypeptides encoded by the nucleic acids of the invention can be variable depending on the desired function of the polypeptide. While smaller fragments can work, generally to be useful, e.g., immunogenic, the polypeptide must be of at least 8 amino acids and not more than 10,000 amino acids.

McCallon Decl., Ex. 3 at col. 5., ll. 23-28.

As explained above, although the patent definition for "fragment" is phrased in terms of an APP protein itself, and "fragment" in the claims refers to both nucleic acids and proteins, AIA submits that the patent definition adaptively applies in both contexts. Thus, in the context of a nucleic acid, "fragment" is simply a part of a nucleic acid encoding for "a truncated APP isoform or a modified APP isoform," or other APP form. And in the context of a protein, "fragment" is the truncated APP isoform, modified APP isoform, or other APP form itself. No further construction is necessary.

Mayo and Myriad's proposal for "fragment," on the other hand, is directly opposed to the definition stated in the patent.[6] Not only that, but Mayo and Myriad's protein-specific definition

---

[6] Mayo and Myriad clearly recognize that the inventor specifically defined "fragment," as they incorporate the same "truncated or modified" language found in the patent.

of "fragment" is incompatible with the use of "fragment" in the context of the nucleic acid described in claim 1. AIA submits that the adaptable definition of "fragment" in the patent specification should control over Mayo and Myriad's contrary construction.

In sum, the patent makes abundantly clear that these three disputed phrases/terms, taken individually or together, encompass nucleic acids encoding for all of the various APP isoforms, as well as other forms, so long as the sequence includes the claimed mutation.

### 2. "vector operable in a mammalian cell"

Both parties essentially agree that a "vector" is a vehicle that can deliver a nucleic acid sequence to a host cell and that can express a polypeptide encoded by the sequence once it arrives in the cell. Both parties also agree that the vehicle can take the form of the nucleic acid itself or can be another molecule containing the nucleic acid, such as a virus. The main point of distinction between AIA's construction of "vector" and Mayo and Myriad's construction of that term, however, is that Mayo and Myriad would require a vector to deliver *and* express DNA in a cell, whereas AIA would merely require the vector to deliver *and/or* express DNA in a cell.

| Limitation ('169 Patent, Claims 9-10) | AIA's Construction | Mayo and Myriad's Expected Construction |
|---|---|---|
| vector operable in a mammalian cell | a polynucleotide, or vehicle containing a polynucleotide (such as a virus or bacteriophage), capable of transferring a DNA or cDNA sequence of interest into a host cell and/or expressing the DNA or cDNA once delivered | A virus or nucleic acid capable of functioning as a vehicle to deliver and allow expression of DNA in a mammalian cell |

The intrinsic evidence again supports AIA's proposed construction. While a "vector" may be used to deliver, or transfect, DNA segments of interest to a host cell, (*see e.g.* McCallon Decl., Ex. 2 at col. 16, ll. 49-56), and express the characteristic portion of APP once there, (*see*

20

*e.g. id.*, Ex. 2 at col. 6, ll. 46-49), it is also clear that certain vectors are capable of replication *inside* the cell. As the specification states, "expression vectors are typically replicable in the host." *Id.*, Ex. 2 at col. 15, ll. 56-58. Replicated expression vectors are inherently located within the cell, and thus do not deliver DNA segments to the cell in the same transfection process that is required when cells do not already contain the vector. AIA's "and/or" construction accommodates these replicated expression-only vectors referenced in the patent because it does not limit the vector to one used for delivery *and* expression; Mayo and Myriad's construction does not. Because Mayo and Myriad's construction again contradicts the intrinsic evidence, the Court should adopt AIA's construction.

 3.     "immortalized mammalian cell line"

The parties recently reached agreement concerning the proper construction of the phrase "immortalized mammalian cell line," which appears in claims 10-12 of the '169 Patent. The parties therefore request that the Court construe this phrase as follows:

| Limitation ('169 Patent, Claims 10-12) | The Parties' Construction |
|---|---|
| immortalized mammalian cell line | a type of mammalian cell that has the ability to replicate indefinitely in culture |

 4.     "purified"

The term "purified" appears only in the lone claim of the '963 Patent. Mayo and Myriad's proposed construction requires a virtually unobtainable level of purity and again conflicts with the intrinsic evidence.

| Limitation ('963 Patent, Claim 1) | AIA's Construction | Mayo and Myriad's Expected Construction |
|---|---|---|
| purified | materially separate from unwanted contaminants | homogeneous preparation of a specific polypeptide |

21

Mayo and Myriad's proposed construction apparently is shaped by *Methods In Molecular Biology*, which states that a "protein is totally pure only when it is known to contain only a single species uncontaminated with salts or adventious water." McCallon Decl., Ex. 8. The '963 Patent, however, does not require "total purity." In describing one of the preferred embodiments, the patent explains that the claimed polypeptides and related antibodies may be harvested from immunized mice as an antiserum and "further purified" by chromatography—plainly suggesting that the polypeptides as claimed do not exhibit absolute purity. *Id.*, Ex. 3 at col. 15, ll. 45-53. Indeed, Mayo and Myriad's own extrinsic evidence explains that "absolute purity can never be established." *Id.*, Ex. 8 at.

Rather than construe the term so as to require the impossible, the Court should construe "purified" to mean "materially separate from unwanted contaminants," without an underlying requirement of total purity. This construction is consistent with the meaning given for "purify" in the *McGraw-Hill Dictionary of Scientific and Technical Terms*, which is "to remove unwanted constituents from a substance." Decl. McCallon, Ex. 7 at p.1610. AIA's proposed construction, unlike Mayo and Myriad's construction, harmonizes both the intrinsic and extrinsic evidence and should therefore be adopted.

5.    "polypeptide encoded by a nucleic acid which encodes a human amyloid precursor protein"

The phrase "polypeptide encoded by a nucleic acid which encodes a human amyloid precursor protein" also appears only in claim 1 of the '963 Patent. Mayo and Myriad would limit this phrase to polypeptides that are recognized isoforms of APP, and thus exclude polypeptides that are less than a full isoform of APP. AIA's construction, unlike Mayo and Myriad's construction, does not artificially add a "recognized isoform" limitation to the phrase and thus allows for additional APP "forms," just as the patent envisions.

22

| Limitation ('963 Patent, Claim 1) | AIA's Construction | Mayo and Myriad's Expected Construction |
|---|---|---|
| polypeptide encoded by a nucleic acid which encodes a human amyloid precursor protein | any one of the forms or isoforms of the human amyloid precursor protein | any one of the isoforms of the human amyloid precursor protein |

As noted above, the patent expressly extends to polypeptides of numerous different lengths, including those with as few as 8 amino acids:

> Likewise, polypeptides encoded by the nucleic acids of the invention can be variable depending on the desired function of the polypeptide. While smaller fragments can work, generally to be useful, e.g., immunogenic, the polypeptide must be of at least 8 amino acids and not more than 10,000 amino acids.

McCallon Decl., Ex. 3 at col. 5., ll. 23-28. A polypeptide with 8 amino acids is not a recognized APP isoform, but the patent expressly extends to such a "form." For this reason alone, Mayo and Myriad's construction is once again inconsistent with the intrinsic evidence.

In addition, claim 1 of the '963 Patent merely describes polypeptides that are encoded by an APP gene with the Swedish mutation, and references codons 670 and 671 of the APP770 sequence in doing so. Because, as explained above, the nucleic acid encoding for APP770 encompasses all APP-encoding sequences and codons 670 and 671 are adaptive positional references that are applicable to multiple different forms and isoforms, it is clear that the resulting polypeptide of the '963 Patent can be any APP form or isoform.

## IV.    CONCLUSION

Both the intrinsic and extrinsic evidence support AIA's proposed claim constructions, and uniformly refute Mayo and Myriad's constructions. As such, AIA respectfully requests that the Court construe the disputed terms of the patent in accordance with AIA's proposals above, and grant such further relief as it deems just and proper.

23

Respectfully submitted,

LATHROP & GAGE LLP


By:  s/ William A. Rudy
     William A. Rudy
     David V. Clark
     LATHROP & GAGE LLP
     2345 Grand Boulevard, Suite 2200
     Kansas City, Missouri  64108-2684
     Tel:  (816) 292-2000
     Fax:  (816) 292-2001
     wrudy@lathropgage.com
     dclark@lathropgage.com

     Pedro F. Bajo, Jr., FBN 966029
     Richard H. Martin, FBN 579831
     AKERMAN SENTERFITT
     401 E. Jackson St., Suite 1700
     Tampa, FL 33601-3273
     Tel: (813) 223-7333
     Fax: (813) 223-2837
     pedro.bajo@akerman.com
     richard.martin@akerman.com

     Dan Cleveland, Jr.
     Michael G. Martin
     LATHROP & GAGE LLP
     4845 Pearl E. Circle, Suite 302
     Boulder, CO 80301
     Tel: (720) 931-3012
     Fax  (:720) 931-3001
     dcleveland@lathropgage.com
     mmartin@lathropgage.com

     *Attorneys for Defendant/Counter-Plaintiff  Alzheimer's Institute of America, Inc.*

24

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 24, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send notice of electronic filing to all CM/ECF participants.

<u>s/ William A. Rudy</u>
*Attorneys for Defendant/Counter-Plaintiff*
*Alzheimer's Institute of America, Inc.*