UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MAYO CLINIC JACKSONVILLE, et al.,

    Plaintiffs,

v.                                    CASE NO: 8:05-cv-639-T-23TBM
                                                      8:05-cv-1049-T-23TBM
ALZHEIMER'S INSTITUTE
OF AMERICA, INC.,

    Defendant.
_____/

## **ORDER**

Pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, Mayo Clinic Jacksonville and Mayo Foundation for Medical Education and Research ("Mayo Jacksonville" and "Mayo FMER," respectively) (together, "Mayo"); along with Myriad Genetics, Inc., and Myriad Pharmaceuticals, Inc. (together, "Myriad") move (Doc. 81) to dismiss counts three and four of Alzheimer's Institute of America's ("AIA") "Amended Answer, Affirmative Defenses, and Amended Counterclaims to Plaintiffs' Amended Complaint" ([Doc. 71-2] the "counterclaim"). The plaintiffs contend that, as pleaded, counts three and four are preempted by federal patent law. AIA responds in opposition (Doc. 88), and with leave of court, the plaintiffs reply (Doc. 92) and AIA surreplies (Doc. 99).

## **BACKGROUND**

The counterclaim alleges that AIA owns both (1) United States Patent No. 5,455,169 (the "'169 Patent" [Doc. 71-3]), entitled "Nucleic Acids for Diagnosing and Modeling Alzheimer's Disease" and claiming a nucleic acid sequence encoding a

mutated form of human amyloid precursor protein ("APP") (or a fragment of the protein) and a mammalian cell line incorporating the sequence (the "Swedish mutation cell line") and (2) United States Patent No. 5,795,963 (the "'963 Patent" [Doc. 71-4]), entitled "Amyloid Precursor Protein in Alzheimer's Disease" and claiming a mutated form of human APP. The Swedish mutation (Doc. 88 at 3) apparently "generates amyloid from the amyloid precursor protein (APP), which causes Alzheimer's Disease."

On September 13, 1996, AIA and Mayo FMER executed a license agreement by which AIA grants Mayo a non-exclusive license to the Swedish mutation in "Tg2576" mice, i.e., transgenic mice that incorporated the Swedish mutation and (Doc. 88 at 3) "developed pathological characteristics of Alzheimer's disease including amyloid-beta (A$\beta$) plaques." Count two of the counterclaim ("Breach of License Agreement") alleges that Mayo FMER breached the license agreement by distributing and sub-licensing Tg2576 mice to third parties without paying AIA the royalty required by the license agreement. The plaintiff's second affirmative defense alleges (Doc. 71-2 at 7) that the plaintiffs attempted to negotiate an expansion of the license agreement to include cell lines "but did so in bad faith by withholding important information from AIA to hide the nature of their past infringing conduct." Although AIA characterizes (Doc. 88 at 6) this allegation as a "summary" of the plaintiffs' "surreptitious and deceptive conduct," the counterclaim fails to specify the information allegedly withheld.

AIA's response (Doc. 88) purports to supplement the counterclaim and offers the following allegations that (although entitled to no consideration on a motion to dismiss

under Rule 12(b)(6), Federal Rules of Civil Procedure[1]) presumably are available for a prospective amendment of the counterclaim.  On March 11, 1997, Ronald Sexton, president of AIA, met with Mayo to discuss a possible expansion of the license agreement to cover the use of the Swedish mutation in cell lines for the purpose of screening drugs.  Sexton (Doc. 88-2 ¶ 5) "offered Mayo an opportunity to revise the parties' licensing arrangement in order to accommodate a screening capability and/or to convert a nonexclusive license to an exclusive license.  Mayo declined."  Sexton departed the meeting (Doc. 88-2 ¶ 5) "with the belief that Mayo would operate within the parameters of the relationship as set forth in the license agreement," and AIA asserts as a conclusion without elaboration (Doc. 88 at 4) that Sexton's belief was "reasonable."  However, AIA alleges that:

- following the March 11, 1997, meeting (Doc. 88 at 4), "Mayo began developing and making extensive use of cell lines with the Swedish mutation";

- by 1998 (Doc. 88 at 4), "Mayo was collaborating with other entities concerning the Swedish mutation";

- by January 1999 (Doc. 88 at 4), "Mayo's work with the cell lines produced a transgenic line of Chinese Hamster Ovary (CHO) cells that contained the Swedish mutation"; and

- by February 2001 (Doc. 88 at 4), "there were transgenic H4 neuroglioma cells containing the Swedish mutation."

- "Mayo used the mutant CHO and H4 cells to begin screening a variety of candidate drugs" (Doc. 88 at 4) and relied on the resulting screening data in a December 7, 2001, patent application;

- on December 10, 2001 (Doc. 88 at 4-5), "Dr. Susan Stoddard of Mayo attended a meeting with Mayo to discuss Myriad's candidate drug

---

[1] See Car Carriers v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir.1984) ("'[I]it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.' ").

- 3 -

> MPC-7869, which is also known as Flurizan, and the value of Swedish mutation cell lines in the validation process";

- pursuant to the June 12, 2002, transfer agreement (Doc. 88 at 5), "Mayo agreed to give Myriad the data [Mayo] developed using the Swedish mutation cell lines"; and

- on June 2, 2003, Mayo and Myriad entered an agreement by which Mayo (Doc. 88 at 5) licensed to Myriad patent rights under United States Patent No. 6,911,466 (the "'466 Patent"), "that were based on data procured through the use of the Swedish mutation in cell lines."[2]

Without disclosure, Mayo again approached AIA (Doc. 88 at 5) "in an effort to expand its license and obtain retroactive cover for its indiscretions" in 2002. In a May 8, 2002, letter (as interpreted by AIA), Stoddard falsely represented that (Doc. 88 at 5) "Mayo [had] only recently discovered the value of the Swedish mutation in cell lines," and in a June 25, 2002, e-mail, Stoddard either (a) falsely represented (Doc. 88-2 ¶ 7) "that [Mayo] had not collaborated with any other entities, including Myriad, regarding Swedish mutation cell lines" or (b) misrepresented the nature of Mayo's collaboration with Myriad and others (Doc. 88 at 5) by asserting (i) that "Mayo [had] not been 'marketing' [Swedish mutation] cell lines" and (ii) that, although Myriad Genetics had expressed interest in a cell line with the Swedish mutation and Mayo "anticipate[d] that such cell lines would be of interest to any of the large pharma or biotech companies working in the [Alzheimer's disease] field, . . . [Mayo had] had NO discussions with any companies to date."

Count one of the counterclaim ("Patent Infringement") alleges that Mayo Jacksonville performed or directed unauthorized research (documented in an attached publication) (a) using the Swedish mutation cell lines (Doc. 71-2 ¶ 9) "in the form of H4

---

[2] See also Doc. 81 at 6 (construing the counterclaim to allege that, as a result of Dr. Golde's research, "Dr. Golde and Mayo were awarded the ['466 Patent]" and that "[s]ome of the underlying data described in the patent was generated using the allegedly infringing cell lines.").

- 4 -

human neuroglioma cells overexpressing APP695NL to screen a group of twenty nonsteroidal anti-inflammatory drugs" (which, as AIA's response [Doc. 88 at 3] explains, are "candidate drugs for the treatment of Alzheimer's disease") and (b) using "CHO cells overexpressing APP695NL,I-his in performing γ-secretase assays."[3]  Count one asserts that Mayo Jacksonville's acts constitute willful infringement of the patents at issue. Count one further alleges (i) that Mayo FMER sold to Myriad (Doc. 71-2 ¶ 12) "certain research services performed by Mayo Clinic . . . and incorporating Swedish Mutation cell lines" and (ii) that Myriad performed or directed unauthorized research using Swedish Mutation cell lines, benefitted from the research, collaborated in the research, induced others to conduct the research, and used the research (Doc. 71-2 ¶ 13) "to develop new drugs, such as MPC-7869," which is also known as Flurizan. [4]  Count one asserts that Myriad's acts constitute willful infringement of the patents at issue.  Accordingly, count one seeks injunctive relief against Mayo and Myriad under 35 U.S.C. § 283, damages (trebled for willfulness) under 35 U.S.C. § 284, attorneys' fees under 35 U.S.C. § 285, interest, and costs.

Counts three ("Equitable Interest") and four ("Unjust Enrichment") of the counterclaim further allege that, through their "mistaken or willful infringement" of the patents at issue and unauthorized use of the Swedish mutation cell lines, "Mayo and/or Myriad" (a) obtained the '466 Patent and associated technical information and

---

[3] See also Doc. 25 (the plaintiffs' amended complaint) ¶ 12 ("Dr. Todd E. Golde of Mayo Jacksonville conducted research relating to treatments for [Alzheimer's Disease] using . . . cell lines containing the Swedish Mutation.").

[4] See also Doc. 25 ¶ 12 ("As part of [Mayo and Myriad's] collaboration [on the development of Alzheimer's Disease treatments], "Mayo licensed various technology to Myriad and provided to Myriad a cell line containing the Swedish Mutation," which cell line "was to be used to screen for potential [Alzheimer's Disease] treatments . . . .").

(b) profited from the sale or licensing of the patents and technical information, which profit included (Doc. 71-2 ¶ 25) "at least one hundred million dollars" that Myriad obtained through a "license and exchange of data" with a third party.   Accordingly, requesting disgorgement, restitution, and a constructive trust or equitable lien, counts three and four assert that Mayo and Myriad were unjustly enriched by their unauthorized use of the Swedish mutation cell lines.

## DISCUSSION

A motion under Rule 12(b)(6), Federal Rules of Civil Procedure, challenges the legal sufficiency of the complaint.  The complaint's factual allegations are accepted as true and construed most favorably to the plaintiff.  Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007); Christopher v. Harbury, 536 U.S. 403, 406 (2002).  Rule 8(a)(2), Federal Rules of Civil Procedure, requires a short and plain statement of the claim that fairly notifies the defendant of both the claim and the supporting grounds.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citation omitted).  "Factual allegations must be enough to raise [the plaintiff's] right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted).  In short, the complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

"Federal Circuit law governs whether federal patent law preempts a state law claim." Ultra-Precision Mfg., Ltd. v. Ford Motor Co., 411 F.3d 1369, 1376 (Fed. Cir. 2005). A state law claim is preempted if it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Ultra-Precision, 411 F.3d at 1377 (quoting Aronson v. Quick Point Pencil Co., 440 U.S. 257, 262 (1979)). Federal patent law preempts a state law claim that "offer[s] patent-like protection to intellectual property inconsistent with the federal scheme." Dow Chem. Co. v. Exxon Corp., 139 F.3d 1470, 1475 (Fed. Cir. 1998). The preemption inquiry focuses on the conduct on which the state law claim is based. Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1335 (Fed. Cir. 1998). "If a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, which must be preempted for conflict with federal patent law." Hunter Douglas, 153 F.3d at 1335.

Patent infringement is governed exclusively by federal patent law. Further, a state law claim effectively increasing the damages available for patent infringement beyond those prescribed by Section 284 would offer "patent-like protection to intellectual property inconsistent with the federal scheme." Dow Chemical, 139 F.3d at 1475.[5] If allowed, a claim of this kind would conflict with limitations on damages in Section 284, including a limitation (the unavailability of an accounting of the infringer's profits) that Congress

---

[5] See Waner v. Ford Motor Co., 331 F.3d 851, 856 (Fed. Cir. 2003) ("Absent secrecy, state law cannot create a collateral set of rights available as an adjunct or expansion to patent rights."); Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 149 (1989) ("Once an inventor has decided to lift the veil of secrecy from his work, he must choose the protection of a federal patent or the dedication of his idea to the public at large"); Abbott Labs. v. Brennan, 952 F.2d 1346, 1357 (Fed. Cir. 1991).

adopted after long experience with a broader provision.[6]  In short, even if an infringer's actual gain exceeds the damages available under Section 284, a state law claim based on patent infringement is preempted.

Of course, a state law claim requiring determination of an issue of patent law is not for that reason alone preempted.  See Dow Chemical, 139 F.3d at 1475-76.  Additionally, determining whether a claim is based on conduct governed by federal patent law can be difficult.[7]  However, "to survive preemption, [the plaintiff] must plead conduct in violation of [state law] that is separate and independent from its patent law claim."  Veto Pro Pac, LLC v. Custom Leathercraft Mfg. Co., Inc., No. 3:08-cv-302 (VLB), 2009 WL 276369, *2 (D. Conn. Feb. 5, 2009) (federal patent law preempts state law claims that merely incorporate by reference two counts of patent infringement and assert that the infringement also constitutes unjust enrichment and unfair competition under Connecticut law).

AIA insists that counts three and four rely on marketplace conduct (Doc. 88 at 1) "wholly apart from Plaintiffs' infringement."[8]  AIA argues that the conduct underlying counts three and four is (Doc. 88 at 13)  "not infringement, but Plaintiffs' deception and

---

[6] See Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476 (1964) (plurality opinion); Zegers v. Zegers, Inc., 458 F.2d 726 (7th Cir. 1972); Georgia-Pacific Corp. v. United States Plywood Corp., 243 F. Supp. 500 (S.D.N.Y. 1965).  But cf. Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 654-55 (Fed. Cir. 1985); 7 Chisum on Patents § 20.02 (2007) (noting that "the infringer's anticipated profits remains a key factor in the determination of a reasonable royalty" under 35 U.S.C. § 284) (emphasis added).

[7] Compare Dow Chem. Co. v. Exxon Corp., 139 F.3d 1470, 1477-78 (Fed. Cir. 1998) (holding that an unfair competition that "likely" required proof of inequitable conduct before the U.S. Patent and Trademark Office was not preempted) with Dow Chemical, 139 F.3d at 1480-81 (Lourie, J., dissenting) (concluding that the claim was preempted as providing damages distinct from the remedies provided in 35 U.S.C. §§ 282 and 285).

[8] See also Doc. 88 at 11 ("AIA's equitable claims address wrongdoing wholly apart from infringement . . .").

- 8 -

bad faith."  AIA further agues that the deception and bad faith comprise (1) Mayo's secretly using the Swedish mutation cell lines (i.e., secretly infringing the patents at issue) and (2) Mayo's subsequent denial (not alleged in the counterclaim) of Mayo's infringement and collaboration with Myriad.  To the extent the counterclaim includes these allegations, the question is whether Mayo's alleged secrecy and concealment of infringement state a claim for unjust enrichment under Florida law.[9]  AIA cites no authority establishing a general common law duty on the part of an infringer (a) to affirmatively disclose infringement while negotiating a license or (b) to refrain from conduct that, although not amounting to fraud (a claim not pleaded by AIA) or abuse of a confidential relationship and not otherwise actionable under the Florida law of unfair competition, misleads a negotiating partner.  The allegations (if true) appear relevant to a determination of a reasonable royalty, a potential award of increased damages and attorneys' fees, and perhaps (although the parties have not briefed the issue) to an equitable remedy under federal patent law.  However, counts three[10] and four as pleaded fail to state a claim for unjust enrichment under Florida (or Utah) law.  The difficulty of determining whether an unjust enrichment claim is "more than an attempt to obtain a patent-like remedy for making, using, or selling a patented product" often precludes early

---

[9] "The essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).

[10]  To the extent that count three purports to state a claim under Florida (or Utah) law, the count (entitled "Equitable Interest" but seeking relief for "the amount of unjust enrichment" the plaintiffs allegedly obtained as a result of conduct identical to that alleged in count four) either duplicates count four or merely requests an alternative remedy.

- 9 -

dismissal under Rule 12(b)(6).[11]  However, in this instance, no difficulty appears.  To the extent that counts three and four of the counterclaim purport to state a claim under state law relying on the plaintiffs' infringement, the counts are preempted by federal patent law.  Otherwise, counts three and four fail to state a claim that is "plausible on its face." See Twombly, 550 U.S. at 570.

## CONCLUSION

The Mayo plaintiffs' motion (Doc. 81) is **GRANTED IN PART**.  To the extent that counts three and four of the counterclaim purport to assert under state law a claim relying on the plaintiffs' patent infringement, the counts are preempted by federal patent law.  Otherwise, counts three and four fail to state a claim under state law and are **DISMISSED**.  On or before **July 27, 2009**, AIA may file an amended counterclaim.

ORDERED in Tampa, Florida, on June 26, 2009.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[11] See Knova Software, Inc. v. Inquira, Inc., No. 06-381-JJF, 2007 WL 1232186, *3 (D. Del. Apr. 27, 2007).